Hegeman-Harris Company, Inc., Appellant, v. Tebbetts and Garland Company, Appellee.

Gen. No. 34,903.

Opinion filed October 9, 1931.

Rehearing denied October 21, 1931.

TAYLOR, MILLER, BUSCH & BOYDEN and EVANS & ROBINSON, for appellant; EIDLITZ & HULSE, of counsel.

POPPENHUSEN, JOHNSTON, THOMPSON & COLE, for appellee; EDWARD R. JOHNSTON and EDWARD J. FLEMING, of counsel.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

In an action in assumpsit, commenced on April 22, 1930, and based upon a building contract, plaintiff (contractor) sought to recover of defendant (owner) the sum of $17,024.88. The cause was tried before the court without a jury and on November 18, 1930, the court found the issues in favor of defendant and entered a judgment against plaintiff for costs. The present appeal followed.

Plaintiff's declaration consists of two special counts and the common counts. In the first special count the contract, dated March 17, 1928, is set forth in full. It is signed by defendant, as first party and designated as the "Owner" and by plaintiff, as second party and designated as the "General Contractor." It recites that on December 14, 1927, the parties entered into another contract by the terms of which the contractor was to commence the erection of a building at Nos. 16-30 West Washington street, Chicago; that it commenced the work; that complete plans and specifications have been drawn by Schmidt, Garden and Erikson, architects; that in pursuance of the work already done various contracts have been let for parts of the work by the contractor "in the name of and as the agent of the owner"; and that it has been determined to make a contract between the parties by which the contractor "shall become the General Contractor for the erection and construction of said building, according to said complete plans and specifications." Then

follow 24 paragraphs, some of which are in substance
as follows:

Paragraph 1.   The General Contractor (plaintiff) is
to furnish all labor, materials, etc. necessary for the
erection and completion of the store and office build-
ing on the premises, as called for by the complete plans
and specifications and under the directions of the
architects.

Par. 3.   The Owner (defendant) is to pay to the
General Contractor "the *actual cost* of said erection
and completion *plus a fixed fee* to the General Contrac-
tor of five per cent (5%) on said actual cost" (except
on the cost of the steel delivered on which the fixed fee
is to be 2%) subject to the following qualifications,
terms and conditions:

"The General Contractor hereby guarantees to the
Owner that the cost of the erection and completion of
said building (including the cost of all work hereto-
fore contracted for and/or completed or partially com-
pleted by the General Contractor under said contract
of December 14, 1927), *including the fixed fee* of said
General Contractor, *will not exceed the sum of
$2,254,418,* which sum is hereinafter referred to as the
'Maximum Guaranteed Cost,' and if the actual cost of
said building, as above defined, *inclusive* of the fixed
fee of the General Contractor, *exceeds* said Maximum
Guaranteed Cost, *then* the General Contractor agrees
to pay from its own funds all amounts in excess of said
Maximum Guaranteed Cost." (Then follows the state-
ment that in said Maximum Guaranteed Cost no provi-
sion has been made for seven mentioned items entering
into said construction.  Two of these items are (4)
"the cost of bonds, if any, furnished by subcontrac-
tors," excepting one mentioned bond already given,
and (7) "the amount by which any subcontract *let at
the direction of the Owner* shall exceed the amount of
any bid for the same work received by the General
Contractor from a subcontractor, who shall be ap-

proved by the Architects and whom the Owner directs the General Contractor not to contract with"). . . .

"In no event however shall the Owner be required to pay to the General Contractor a greater amount than the *actual cost* of the erection and completion of said building according to said complete plans and specifications, *plus said fixed fee* of said General Contractor, as aforesaid."

Par. 4. "The General Contractor may with the written approval of the Architects and the Owner, sublet all or any portion of the work required to be done hereunder." . . . "The question of requiring surety bonds from the subcontractors, or any of them, shall be determined by the General Contractor."

"The General Contractor shall, however, and does hereby, *assume full responsibility for the performance by the subcontractors,* in the manner and under the conditions provided and required under the complete plans and specifications and the terms of this agreement, *of the work* called for by such subcontracts, *and full responsibility for the performance* of all work remaining unfinished under any and all contracts heretofore let by the General Contractor *in the name of and as agent of the Owner"* (subject to certain qualifications mentioned in succeeding paragraphs.)

Par. 10. The General Contractor is to submit monthly requisition statements to the Owner and Architects, showing all work done by it and the cost thereof, and also all work done and/or materials furnished by any subcontractor together with the amount due therefor. *"Architects' certificates shall be issued* within ten (10) days after such requisition statement is made therefor for the amounts as determined by the Architects to be due the General Contractor for the work done by said General Contractor, including the proportionate amount of the fixed fee then due to the General Contractor and for 85 per cent of the amount due any and all subcontractors."

Par. 11. After the work of any subcontractor has been completed and a sufficient time has elapsed to demonstrate that such work has been properly done, etc., "all or any part of said 15 per cent reserved from the amount due any subcontractor shall, *upon architects' certificates* be paid to the General Contractor for such subcontractor."

Par. 13. "All moneys at any time paid hereunder to the General Contractor shall be deposited by it in a special bank account in the Bank of America, in which no other funds are to be deposited except the special trust fund of $10,000, hereinafter provided for. The moneys in such special bank account at any time are to be applied and disbursed *prior to the final completion and payment in full for said improvements* only as follows:

1. To the payment of the amount due the General Contractor, *as shown by the Architects' certificates issued to it.*

2. To the payment of the amount due the subcontractors, material men and others *as directed by Architects' certificates theretofore issued."* . . .

Par. 20. "The Owner reserves the right to *require* the General Contractor to employ a subcontractor *designated by the Owner* and approved by the Architects on any part of the work which is to be sublet; and to *require* the General Contractor to take bids on any part of the work which the General Contractor itself proposes to do, . . ."

In said first special count it is alleged that "plaintiff has done all things necessary for the construction and completion of the building as required under said contract"; that the building "was substantially completed and accepted by the Owner (defendant) more than one year prior to the date of the institution of this suit and has ever since been occupied and used by it and its tenants"; that the total "actual cost" for the construction and completion of the building, "*exclu-*

*sive* of the cost of extras and additions. . . was $2,035,562.20''; that all of said amount, together with the contractor's fee thereon, has been paid by defendant, *except* the sum of $17,024.88 (including plaintiff's fee as contractor); that said last mentioned sum ''is the balance of the cost of painting, decorating and wood finishing on said building as provided in the plans and specifications''; and that, although said sum is justly due and owing to plaintiff, defendant has refused upon request to pay the same to plaintiff, etc.

In the second special count similar allegations are made and it is also alleged that ''the actual cost of *additions and extras* under the contract, . . . less deductions, was $253,132.56, which amount has been paid by defendant''; that the ''maximum guaranteed cost of $2,254,418,'' as provided in the contract, ''was increased by said net amount of additions and extras of $253,132.56, making the *maximum guaranteed cost,* as adjusted, $2,507,550.56''; that ''the total actual cost to the general contractor (plaintiff) for the entire work included under the contract, with said net amount of additions and extras, was $2,288,694.76, and the contractor's fee . . . was $105,964.42, *making a total of $2,394,659.18''*; that all of said last mentioned sum has been paid by defendant except the sum of $17,024.88 (including plaintiff's fee as contractor); and that defendant, although often requested, has refused to pay to plaintiff said sum of $17,024.88, etc.

To the declaration defendant filed a plea of the general issue, and also an affidavit of merits in which it denied that the sum of $17,024.88, *or any sum,* was due to plaintiff. Prior to the trial defendant was allowed to file an amendment to its affidavit of merits in which it alleged, as an additional defense, the following:

' ''That, pursuant to the terms and conditions of said contract, all payments to be made by defendant to plaintiff were to be made only as shown by architects' certificates, issued by the architects named therein

(Schmidt, Garden & Erikson) to plaintiff and upon the presentation of such certificates to defendant; and that plaintiff has never received from said architects a certificate for the whole or any part of said sum of $17,024.88, sued for by plaintiff herein, and has never presented an architect's certificate therefor, or for any part thereof, to defendant."

During the trial, in addition to the testimony of witnesses presented by the parties and to certain documentary evidence introduced by plaintiff, including said contract of March 17, 1928, various stipulations or agreements were entered into, one of which is as follows:

"It was agreed by counsel that the amount of *overrun* on painting was $16,214.17, for labor and materials, plus $810.71, for the contractor's fee of five per cent, or a total of $17,024.88. It was also agreed that the work was done and the material furnished and had been checked by the architect and found to be actually furnished, and that *the total amount in contest in this action,* and for which plaintiff sues, *is $14,408.41,* for the work done by Plamondon-Gabriel and materials furnished. It was also agreed by counsel that Hegeman-Harris Co. (plaintiff) had no subcontract with Plamondon-Gabriel but employed them, and they did the work on a time and material basis, which was paid for by Hegeman-Harris Co."

And it was further stipulated and agreed as follows:

"That after the default by the Sullivan Co. (subcontractor for the painting, etc.) and after Mr. Evans and Mr. Greenspahn (attorneys) were called into the matter, representing respectively the plaintiff and the defendant, Mr. Greenspahn took the position that under the contract it was the obligation of the contractor (plaintiff) to complete the painting job even though it cost more than the Sullivan contract, and Mr. Evans took the contrary position that *it was the obligation of the owner* (defendant), and those positions were main-

tained respectively by the representatives of the plaintiff and the defendant up to the time this suit was brought; and that it was further understood this work should go ahead and the matter of the construction of the contract should be determined later.''

During the trial, also, plaintiff introduced two letters addressed to it and signed by defendant, by H. A. Loeb, Treas. One letter, dated January 2, 1930, is in part as follows:

''On your alleged claim for the excess cost of the painting, which the architects and ourselves have refused to approve, allow or pay, amounting to $17,024.88, . . . it is understood that you *have not released this claim in final settlement,* and that you are free to pursue such course as you may determine to collect on this claim.''

The other letter, dated January 13, 1930, is in part as follows:

''This is to acknowledge receipt of your letter of January 8, 1930, reading as follows: 'This is to certify that the undersigned general contractor for the erection of the building at 16-30 West Washington street, Chicago, has completed said building in accordance with the plans and specifications therefor, and that the only outstanding claim in connection with the construction of the building under the contract with the undersigned is the claim of Ralph A. Bond & Co. for $2,129.11.'

''We acknowledge that the above letter was given by you in order that we might make an adjustment with the Trust Company who is holding funds on this job *and is without prejudice to your claim for $17,024.88,* being the excess cost of the painting, . . .

''As to the item of excess cost of painting above specified, *it is understood that you have not released this claim in any way,* and are free to pursue such course as you may determine to collect on the same.''

It further appears from the evidence that plaintiff, with the approval of the architects and defendant, made in all about fifty-two (52) subcontracts for work on the building; that of these subcontractors plaintiff saw fit to require performance bonds of only four or five of them; that one of the subcontracts was made with J. P. Sullivan Co. for the painting, etc. work, whose accepted bid was $17,880; that plaintiff did not require or obtain from it a performance bond; that the Sullivan Co. entered upon said painting etc. work and furnished labor and materials to the value of $7,647; that it was paid $6,500, or 85 per cent thereof; that it abandoned its contract and did no further work on the building; that afterwards plaintiff, with the approval of the architects and defendant, made an arrangement with Plamondon-Gabriel Co., upon a time and material basis, to complete said painting etc. work and the same thereafter was completed to the satisfaction of the architects; that the amount of the Sullivan contract, "as adjusted by extras and additions," was $17,083.82, which sum was paid to plaintiff; and that plaintiff, in causing the painting etc. work to be completed through Plamondon-Gabriel Co., expended, *in addition* to the Sullivan contract prices as adjusted, the said sum of $14,408.41, as stipulated.

It further appears from the terms of the contract sued upon and from other stipulations and agreements made on the trial as follows:

Maximum *guaranteed* cost as per contract $2,254,418.00
Stipulated extras to be added thereto .... 253,132.56

Maximum *guaranteed* cost including said
    extras ...........................$2,507,550.56
Total *actual* cost of building, including
    architects' fees, but *excluding* said sum
    of $14,408.41, in dispute for said paint-
    ing work, as stipulated ...............$2,377,634.30

Excess of maximum cost, as guaranteed,
over total *actual* cost ................ $129,916.26

It thus appears that, if said sum of $14,408.41 should be allowed to plaintiff and paid by defendant, the total actual cost of the building to defendant would be less than said maximum guaranteed cost by about $115,500.

In urging that the finding and judgment of the trial court in defendant's favor should be affirmed, defendant's counsel make the following statements in their printed brief here filed:

"Obviously, the Sullivan Co. did not perform the work called for by its subcontract. By the provisions of paragraph 4 of the contract (referred to above) plaintiff assumed *full responsibility* for the performance by the Sullivan Co. of the work called for by its subcontract. In other words, it *guaranteed* that the Sullivan Co. would do the work which its contract obligated it to do in accordance with the plans and specifications. Had the Sullivan Co. completed 'the work called for by such subcontract' there would have been no additional cost to either plaintiff or defendant, for the Sullivan Co.'s compensation was fixed. By reason of the Sullivan Co.'s default the work called for by its subcontract cost an additional $14,408.41. Who should pay this additional cost? That is the law suit.

"Defendant contends that, unless the language of paragraph 4 of the contract is to be robbed of all significance, the agreement of Hegeman-Harris Co., to assume full responsibility for the performance by Sullivan Co. of the work called for by its subcontract, *amounts to a guaranty of performance.* Sullivan Co.'s failure to perform the work which it contracted to do was the sole cause of the additional expenditures made necessary in order to finish the Sullivan subcontract. Therefore, as between plaintiff and defendant, plaintiff, who had contracted to see that subcontractors fully performed their subcontracts, should bear the additional expense."

Replying to the above contentions, plaintiff's counsel contend that, although by the provisions of paragraph 4 of the contract plaintiff "assumed full responsibility for the *performance* by the Sullivan Co. *of the work* called for by its subcontract," there is nothing in said paragraph 4, or in the entire contract, to sustain the claim that plaintiff guaranteed that the painting work on the building would be done *at the price* named in the Sullivan Co.'s subcontract. And plaintiff's counsel further contend that the particular clause (relied upon by defendant's counsel), in said paragraph 4, was inserted "not as a guaranty of *cost,* but as one of various clauses to maintain the relation of owner and independent contractor as distinguished from the relation of principal and agent."

After considering the entire contract, and particularly the provisions of paragraphs 3 and 4, we agree with said contentions of plaintiff's counsel. We do not find anywhere in the contract that plaintiff guaranteed that the work to be performed by any subcontractor should be performed *at the price* named in the subcontract. We do find, however, that in paragraph 3 the general contractor (plaintiff) guaranteed to the owner (defendant) that the cost of the entire work on the building, including the fixed fee of said contractor, should not exceed a certain named sum, which is termed the "Maximum Guaranteed Cost." And in said paragraph 3 there is the further provision that "if the *actual cost* of said building, . . . inclusive of the fixed fee of the general contractor, *exceeds* said Maximum Guaranteed Cost, *then* the general contractor agrees to pay *from its own funds* all amounts in excess of said Maximum Guaranteed Cost." And it appears from the stipulated facts and the evidence that if said sum of $14,408.41 (here involved) be paid to plaintiff by defendant, said Maximum Guaranteed Cost will not be exceeded. Furthermore, we are of the opinion that, if the construction as to paragraph 4 of the contract,

as urged by defendant's counsel, is to be adopted, the practical effect is to nullify the provisions of paragraph 3 as to the Maximum Guaranteed Cost of the entire work. It appears from the evidence that there were about 52 subcontracts let for the work on the building and that the aggregate amount of these contracts (exclusive of the "overrun" on the Sullivan Co.'s painting contract) was in excess of $2,150,000. We do not think that under all the provisions of the contract it was the intention of the parties that the general contractor, in addition to guaranteeing that the Maximum Cost of the entire work should not exceed a certain named sum, should also guarantee the performance of 52 separate subcontracts *at the respective prices named therein.* Such a construction of a "cost plus" contract, as is the present contract, would not in our opinion be fair to the contractor, and the tendency of the courts is to construe such contracts liberally. (*Westinghouse, Church, Kerr & Co. v. Long Island R. Co.,* 145 N. Y. S. 201, 202; *Standard Oil Co. v. United States,* 264 Fed. 66, 69; see, also, *R. F. Conway Co. v. City of Chicago,* 274 Ill. 369, 378.)

Defendant's counsel call attention to a clause in paragraph 4 of the contract where, as they state, the general contractor (plaintiff) is given the right at its discretion to require performance bonds from all subcontractors, and they contend that said clause "clearly indicates the intention of the parties to make the general contractor liable for performance by subcontractors, and at the same time to enable the general contractor to be fully protected against loss by reason of its guaranty." We fail to see wherein this particular clause has any material bearing on the present issue. Plaintiff was not at fault in failing to require a performance bond from the Sullivan Co. Whether or not a subcontractor's bond should be required of any subcontractor was, under the wording of said clause, solely within the discretion of the general contractor

(plaintiff). And the evidence shows that it required performance bonds from only four or five of the 52 subcontractors.

Defendant's counsel further contend in substance that, even if the trial court was wrong in construing the contract as placing an obligation upon plaintiff of seeing to it that subcontractors perform the work called for by these subcontracts and *at the prices* named therein, nevertheless the judgment appealed from was right, for the reason that it was made a *condition precedent* in the contract that, before plaintiff could recover for the amount here involved ($14,408.41), it must obtain an architect's certificate therefor and no such certificate was issued, although requested. After considering the provisions as contained in paragraphs 10, 11 and 13 (above mentioned) of the contract, wherein architects' certificates are referred to, we do not think that, because of the provisions in said paragraphs or of any other provisions in the contract, it should be held that the obtaining by plaintiff of an architect's certificate was a condition precedent to the payment to it of the particular sum which it now seeks. Furthermore, in view of defendant's letters to plaintiff of January 2, and January 13, 1930 (above set forth), of the stipulations made upon the trial, and of certain undisputed testimony of plaintiff's witnesses, Hall and Baxendale, we are of the opinion that, even if the obtaining of an architects' certificate might be considered as a condition precedent to the payment of said particular sum, the condition should be held to have been waived by defendant. In *Andrew Lohr Bottling Co. v. Ferguson,* 223 Ill. 88, 93 (a building contract case), it is said: "There can be no doubt of the rule that a party having a right to insist upon a condition precedent to the payment of money or other performance on his part will waive the condition precedent by a total denial of liability or by placing his refusal to perform on other grounds. This rule has often been applied

to contracts of insurance, but it is a salutary and well established rule of the common law, the application of which to all contracts will effect justice and cut off subsequently discovered excuses for the violation of contract engagements.'' (See, also, *Masek v. Chmelik,* 169 Ill. App. 589, 592; *Connelly v. Wallin,* 181 Ill. App. 212, 214.)

Our conclusions are that the superior court erred in entering the judgment appealed from in favor of defendant, and that, under the undisputed and stipulated facts, plaintiff is entitled to recover of defendant the sum of $14,408.41, as a matter of law. Accordingly the judgment of the superior court is reversed, and judgment will be entered here in favor of Hegeman-Harris Co., Inc. (plaintiff), and against Tebbetts and Garland Company (defendant), in the sum of $14,408.41, together with costs in this and the superior court.

*Reversed, and judgment here against defendant.*
KERNER and SCANLAN, JJ., concur.